# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SETONDJI VIRGILE NAHUM

_____

Appellant(s),

vs.

The Boeing Company
Jeffrey Dillaman

_____

Appellee(s).

9th Cir. Case No. <u>21-35008</u>

District Court or
BAP Case No. <u>2:19-cv-01114-BJP</u>

## APPELLANT'S INFORMAL OPENING BRIEF

*(attach additional sheets as necessary, up to a total of 50 pages including this form)*

**JURISDICTION.** This information helps the court determine if it can review your case.

1.  Timeliness of Appeal:

    a.  What is the date of the judgment or order that you want this court to review? **<u>12/28/2020 and 12/17/2019</u>**

    b.  Did you file any motion, other than for fees and costs, after the judgment was entered? Answer yes or no: **<u>Yes</u>**

        - If you did, on what date did you file the motion? **<u>12/31/2020 and 12/26/2019 & 04/17/2020</u>**

        - For prisoners or detainees, what date did you give the motion to prison authorities for mailing? **<u>Not Applicable</u>**

        - What date did the district court or bankruptcy appellate panel (BAP) decide the motion that you filed after judgment? **01/04/2021 and 04/02/2020 & 04/20/2020**

    c.  What date did you file your notice of appeal? **01/04/2020**

        - For prisoners or detainees, what date did you give your notice of appeal to prison authorities for mailing? **<u>Not Applicable</u>**

**FACTS.** Include all facts that the court needs to know to decide your case.

2.    What are the facts of your case?

The African/Black plaintiff was a 2nd level Manufacturing Industrial Engineer with the Boeing Company. Prior to this role, Setondji V. Nahum held a position of Tools and Process Engineer I with SAFRAN Labinal, a position of Manufacturing Engineer with Sikorsky Aircraft/Lockheed Martin and launched a small Start-Up, SETUCY L.L.C., where he completed most executive, operations management and marketing tasks.  The plaintiff, Setondji V. Nahum, holds a Bachelor of Science in Aeronautical and Astronautical Engineering from the University of Washington. The plaintiff started pursuing a Master of Science in Aeronautics from Embry-Riddle Aeronautical University in January 2019 and has maintained a 4.0 GPA through the program.

The plaintiff's employment with the Boeing Company started on 02/16/2018. He was hired as a 2nd level Manufacturing Industrial Engineer and assigned to the new 777X program. The plaintiff built assembly schedules for multiple lines and sections of the aircraft and supported manufacturing activities through process analysis & evaluations, capacity analysis, data analysis, manufacturing issues resolutions and other engineering and manufacturing deliverables. The plaintiff supported and generated deliverables for multiple sections of the 777X aircraft.

 Throughout his employment, the African/Black plaintiff  was subjected to acts of intentional racial discrimination, retaliation upon filing an EEOC charge, wrongful termination through the abuse of power, harassment, defamation, conspiracy against rights and retaliation based on audits and work completed with previous employers. In fact, the Boeing Company tactfully issued three "fictitious" corrective actions to wrongfully terminate the African/Black plaintiff's employment on 05/13/2019.

**2.1 Brief Facts for the racial discrimination claim:**

a. **On June 27th, 2018 and On November 14th, 2020, The Defendants and Dillaman Jeffrey issued tactfully discriminative performance evaluations against the plaintiff.**

On June 27th, 2018 and On November 14th, 2020, the white manager Dillaman Jeffrey issued tactfully discriminative performance evaluations where the African/ Black plaintiff actual and overall work performance was intentionally downgraded because "Other white employees and white managers have allegedly complained about fears of approaching the African/Black plaintiff" and "White employees" have refused to work with the African/Black plaintiff". That is literally the reason that was provided to the plaintiff as a justification for downgrading his work performance ratings.

The plaintiff communicated a lack of awareness of these issues, a lack of investigation of these issues and the unfair impact on his overall performance evaluation. The plaintiff indicated to the defendants that "not conducting any investigations and assuming that other white employees were automatically accurate in their false and unjustified allegations about the African/Black" constituted favoritism toward the white employees and differential treatment which put the African and Black employee at a disadvantage. Here, the overall stellar performance of the African/Black plaintiff was downgraded with no proof, no justification and no investigation of false allegations reportedly made by white employees and managers. Please note that the defendants never produced any materials requested by the plaintiffs as it pertains to justifying and proving such communicated feedback/allegations that supported drastically downgrading the plaintiff's performance.

**b.** **On 09/04/2018, 02/07/2019 and 05/13/2019, The Defendants and Dillaman Jeffrey issued three "fictitious" Corrective actions.**

**On 09/04/2018**, the defendants and Dillaman Jeffrey issued a "fictitious" corrective action to the plaintiff for allegedly refusing to write a Production Planning Change Request (PPCR). But the plaintiff never actually refused to write the PPCR and the defendants could not and did not present any materials that showed refusal from the plaintiff. In reality, the plaintiff wrote the PPCR after elevating valid concerns pertaining to procedural violations, discrepancies between written work instructions and process documentation but most importantly a misrepresentation of actual workflow. In this specific case, the plaintiff completed a set of tasks in compliance with work instructions upon approval from the relevant shop managers. For the sole purpose of agonizing the African/Black plaintiff, the defendants, and the white manager: Dillaman Jeffrey opted to deviate from established procedures and instructions to request a rework from the plaintiff. All justifications provided by the defendants were false and the plaintiff demonstrated such through multiple project analysis reports. Nevertheless, the defendants wrongfully issued a corrective action against the plaintiff. Most importantly here, the defendants failed to rescind such corrective action once the plaintiff provided further proof of work completion as well as proof that the request was misrepresenting the actual workflow.

**On 02/07/2019** the defendants and other White Boeing employees issued multiple sets of false allegations against the African/Black Plaintiff through Dillaman Jeffrey, the White manager. In this specific case, the allegations were the direct product of pure falsity and a surprising lack of awareness of manufacturing constraints and opposing stances from other Boeing managers which were the approving stakeholders of the tasks issued to the plaintiff. Although the plaintiff had completed the tasks and issued multiple project reports and status update to all parties, a second

fictitious corrective action was written against the African/Black plaintiff for allegedly not completing the tasks. Here, the plaintiff's direct Industrial engineering management was making requests that manufacturing managers were rejecting. The plaintiff completed his tasks and recommendations, but it could not be implemented because manufacturing managers disagreed with the request made by the plaintiff's direct Industrial management. But, the defendants opted to issue a corrective action against the plaintiff and by such penalizing the plaintiff for program level issues.

**On 05/13/2019**, the defendants and Dillaman Jeffrey issued a third "fictitious" corrective action for allegedly not completing sets of unspecified tasks. This came as a surprise because the plaintiff had just completed capacity analysis, scheduling and multiple process improvement project reports on one of the most difficult and problem-riddled section of the 777X aircraft ( the Doors section). There was no clear rational from the defendants and as for the previous "fictitious" corrective actions, Dillaman Jeffrey who was the accuser, was also the individual providing technical expertise for the investigation of materials submitted by the plaintiff to disprove his false allegations.

**c.  <u>Racial Slurs, Insults and Abuse</u>**

The African/Black plaintiff  who was a 2nd level Engineer was often referred to as a "Problem Child" throughout official Boeing email communications between Boeing employees, Boeing leads and Boeing Managers. Dillaman Jeffrey, a white Boeing Manager, continue to relay this derogatory term to refer to the plaintiff throughout Fact Finding investigations, communications with SPEEA and Communications specific to internal EEOC investigations. The African/Black plaintiff was also directly and indirectly referred to as a  "Dog", a "Bulldog", a "fighting dog", a

"Problem Child", a "Rat" , a "Carpet to be stepped on with approval from management", a "Slave worker".

### d.  <u>Deviated from written procedures in matters pertaining to the plaintiff.</u>

The defendants often deviated from written procedures in matters pertaining to the African/Black plaintiff.

**First**, as it pertains to the completion of industrial engineering deliverables, the defendants often deviated from written procedures, established work instructions, shop management approval, and often attempted to agonize and ridicule the plaintiff through irrational requests and request for misrepresenting actual manufacturing workflow. As such :

- Management requests were contradictory, conflicting, and often violated procedures and instructions.

- Requests made by management were often impossible due to a lack of engineering and production data, late part delivery, missing tools, insufficient headcounts to support work statements.

They often used any such program constraints to harass the plaintiff by continuously requesting deliverables they knew could not be generated due to program deficiencies and supplier's logistics issues.

**Second**, the defendants and Dillaman Jeffrey often abused of the corrective action process to report alleged issues that do not qualify as a corrective action for the sole purpose of wrongfully terminating the plaintiff employment. False allegations reported under the second and third corrective actions stated that the African/Black plaintiff failed to meet Dillaman Jeffrey, the White Managers' expectations. There is a significant difference between *not completing a task* and a *completed task failing to meet unspecified and unclear expectations*. In fact, if Dillaman Jeffrey

believed that the African/Black plaintiff work was not meeting expectations, such issues were to be handled through different company procedures and not corrective actions. In reality, the defendants and Dillaman Jeffrey just abused of their position of the company to discriminate against the plaintiff by deviating from written procedures for the sole purpose of harming the plaintiff through a wrongful employment termination. Moreover, this manager's expectations were unrealistic because as a manager he had failed to address program issues which were his responsibilities, and which generated the constraints that prevented the completion of the requested deliverables.

**e.  <u>Favoritism/Treated differently than other employees.</u>**

The plaintiff was treated significantly differently than his peers and other employees throughout his employment at the Boeing Company. The African/Black employees was subjected to higher scrutiny for no just cause. False allegations from other employees were treated as true without the completion of internal investigations or through the completion of non-genuine internal investigations. While other white employees remain animated and aggressive in their communications with the plaintiff, any assertive communication from the plaintiff was automatically labelled as insubordinate and inappropriate.

Please note that multiple White employees would purposely not respond, or not provide critical input data required for tasks completion. Those white employees were never disciplined or spoken to about their behaviors. In matter fact, it was obvious that such was an intentional practice to attempt to agonize the plaintiff and intentionally prevent the plaintiff from completing deliverables for the purpose of generating "fictitious" allegations and corrective actions.

### 2.2  Brief Facts for the Retaliation upon filing an EEOC Charge claim

On March 18th, 2019, the plaintiff filed an E.E.O.C. racial discrimination charge. The E.E.O.C. notifies organization within 10 business days. As early as April 1st specific/direct management and the individuals behind the reported retaliatory acts were already responding to emails specific to the EEOC charge. This means that they knew about the EEOC charge much earlier enough to provide a response on the 1st of April. As early as April 18th , 2019, the defendants were seeking to terminate the plaintiff's employment. On April 1st, an investigative report seeking to terminate the plaintiff's employment was issued to the employee union, SPEEA. A position statement was provided by the Boeing Company to the EEOC on May 9th, 2019. The plaintiff's employment was wrongfully terminated by the defendants on May 13th, 2019. The representative of the Boeing company who signed the action immediately discharging the plaintiff on May 13th is Jeffrey Dillaman, the defendant. **There are barely eight weeks between the day of the plaintiff officially filing a charge with the E.E.O.C. and the day of the wrongful termination of the plaintiff's employment by the defendants**.

There are also significant emails communications of internal inquiry pertaining to the EEOC Charge where the defendants are seen requesting to just terminate the plaintiff's employment. These email communications also show the defendants making false accusations and such false accusations taken center stage as opposed to the internal inquiry prompted by the EEOC investigation.

### 2.3 Brief Facts for the Wrongful termination through the abuse of power claim

The defendants had no just cause to terminate the plaintiff's employment. The defendants and Dillaman Jeffrey abused of the internal corrective action process to report alleged issues that

do not qualify as a corrective action for the sole purpose of wrongfully terminating the plaintiff employment. False and misconstrue allegations reported under the internal corrective actions stated that the African/Black plaintiff failed to meet Dillaman Jeffrey, the White Managers' expectations. **There is a significant difference between "*not completing a task*" and "*a completed task failing to meet unspecified and unclear expectations*"**. In fact, if Dillaman Jeffrey believed that the African/Black plaintiff work was not meeting expectations, such issues were to be handled through different company procedures and not corrective actions. **In reality, the defendants and Dillaman Jeffrey just abused of their positions at the company to discriminate against the plaintiff by deviating from written procedures for the sole purpose of harming the plaintiff through a wrongful employment termination.**

### 2.4  Brief Facts for the Harassment Claim

The Defendants fostered harassment and a toxic work environment for the plaintiff. The three "fictitious" corrective actions were used as a tool to attempt to intimidate and harass the plaintiff in occurrence of procedural violations, disregard of written procedures and actual manufacturing workflow.

The Defendants continue to harass the plaintiff and attempt to intimidate and force the plaintiff to sign a discriminatory performance evaluation. Although there is no legal mandate or internal regulations that requires the plaintiff to sign a performance evaluation, the defendants included the plaintiff refusal to sign and approve an act of discrimination in a finding against the plaintiff. This was used as an element to issue a 2nd fictitious corrective actions against the plaintiff. This was also used as a tool to wrongfully terminate the plaintiff's employment.

The African/Black plaintiff who was a 2nd level Engineer was often referred to as a "Problem Child" throughout official Boeing email communications between Boeing employees, Boeing leads and Boeing Managers. Dillaman Jeffrey, a white Boeing Manager, continue to relay this derogatory term to refer to the plaintiff throughout Fact Finding investigations, communications with SPEEA and Communications specific to internal EEOC investigations. The African/Black plaintiff was also directly and indirectly referred to as a "Dog", a "Bulldog", a "fighting dog", a "Problem Child", a "Rat" , a "Carpet to be stepped on with approval from management", a "Slave worker".

The defendants continuously assigned extensively mind numbing repetitive excel data entry tasks or visio tasks known to strain the human mind. This was coupled with a lack of data and program constraint out of the plaintiff's control. The assignments often had no rational engineering objective. **It was reasonably evident that the defendants were subtly attempting to harm the plaintiff health through an extensive exposure to the computer blue light and mind straining and extensively repetitive Excel and Visio data entry tasks**.

The defendants often attempted to agonize the plaintiff through futile and premeditated occurrences often characterized by conflicting requests by industrial and manufacturing management, disregard of constraints, irrational requests, petty and plotted conflicts based on insignificant elements pertaining to work deliverables.

### 2.5 <u>Brief Facts for the Defamation Claim</u>

The plaintiff's employment was terminated on 05/13/2019 by the Boeing Company due to a series of false assertion of facts, communication of false assertions of facts and misconstrue facts by the Boeing company that wrongfully put Setondji V. Nahum at fault.

Representatives of the Boeing company had knowledge of the falsity of the statement used to generate fictitious corrective actions. Representatives of the Boeing company chose to recklessly disregard the truth and used a series of false statements to generate fictitious actions for the sole purpose of causing harm to the plaintiff. This caused harm and damages to Setondji V. Nahum's reputation. Through lies, false statements, misconstrue facts and defamation, the Boeing company tactfully downgraded Setondji V. Nahum's work performance. Through defamation per se and libel, the Boeing company generated "fictitious" corrective actions that resulted in Setondji V. Nahum's employment termination. These defamatory statements were published to multiple individuals and entities outside of the Boeing Company. For example, a letter dated July 12th 2019, proves that the Boeing Company continued to purposely disregard the truth and had published such defamatory statements to a company known as "Talx UCM Services" located in St Louis, MO (Appendix I Page 152). These events occurred in Everett, WA. Although the defendants claim privileged communications, the defendants' false statements are characterized by an "inexplicable" blatant disregard for the truth and malicious intent to harm the plaintiff through the wrongful termination of his employment.

### 2.6  Brief Facts for the Conspiracy Against Rights Claim

Conspiracy Against Rights mandates were violated by the defendants in this matter pertaining to the African and Black plaintiff.

The defendants conspired against the plaintiff's civil rights by attempting to deprive the plaintiff of his rights to seek employment with any employer. The Boeing company specified terms of segregation and discriminative terms by attempting to prevent the plaintiff from seeking or accepting employment directly (e.g., as an employee) or indirectly (e.g.,

including without limitation, as a contract hire, consultant, or leased employee) with the Boeing company with company specified by Boeing to include without limitation, anyparent, sister, or subsidiary corporation. Representative of the Boeing company in Everett, WA communicated such terms to Setondji V. Nahum on June 21st, 2019 through an electronic mail attachment by Steve Spyridis a Contract Administrator of the Society of Professional Engineering Employees in Aerospace (SPEEA).

Conspiracy Against Rights mandates makes it unlawful for two or more persons to agree together to injure, threaten or intimidate a person in any state, territory or district in the free exercise or enjoyment of any rights or privileges secured to him/her by the constitution or the laws of the United States. In this specific case, Conspiracy Against Rights mandates do not require that one of the conspirators commit an overt act prior to the conspiracy becoming a crime.

### 2.7 Brief Facts for the retaliation for audits and work completed at previous employers claim.

The plaintiff brings this claim to the court to highlight yet another set of statutory violations against the plaintiff through acts of retaliations for work completed at previous employers.

The Boeing Company and Dillaman Jeffrey requested details of assignment and tasks completed at previous companies which included assignment and 787 audits completed for SAFRAN Labinal as a Boeing contractor and assignments completed at Sikorsky Aircraft. This was to be used to validate the plaintiff's skills ratings and data reported within such scope. Boeing policies for skills ratings allowed for the plaintiff to take credit for his work for any previous work completed for the company and it is Boeing and Dillaman Jeffrey that requested further proof of this work.

But the defendants immediately issued a 2nd series of "inexplicably" false accusations and a 2nd fictitious corrective action against the plaintiff immediately after the plaintiff referenced completed 787 audits which reported dangerous engineering practices which included severe violations of engineering, safety, and ITAR requirements and regulations. It also revealed blatant disregards for FAA regulations and design practices that directly put passengers and customers lives at risk. Engineering work completed by the plaintiffs directly highlighted these engineering and design issues. The defendants' actions against the plaintiff also included the assignment of more irrational projects, illogical tasks and mandatory time-off without pay.

**<u>PROCEEDINGS BEFORE THE DISTRICT COURT OR THE BAP.</u>** In this section, we ask you about what happened before you filed your notice of appeal with this court.

3.    What did you ask the district court or the BAP to do—for example, did you ask the court to award money damages, issue an injunction, or provide some other type of relief?

The plaintiff requested injunctive relief, punitive damages, attorney's fees, and costs (if any) as specified by jurisprudence. The plaintiff also requested compensation including financial compensation as defined by law for every adverse action taken against him. The plaintiff request also includes back pay, front pay, lost benefits, out-of-pocket losses, pain and suffering for every adverse action taken against him. Finally, the plaintiff requested that the court compels the defendants to admit the truth and provide further details of the illegal and discriminatory actions taken against the plaintiff.

4.      What legal claim or claims did you raise in the district court or at the BAP?

- Claim 1: Racial Discrimination
- Claim 2: Retaliation upon filing an EEOC charge.
- Claim 3: Wrongful Termination through the Abuse of Power
- Claim 4: Harassment.
- Claim 5: Defamation.
- Claim 6: Conspiracy Against Rights
- Claim 7: Retaliation for assignment and tasks completed at previous employers

5.      **Exhaustion of Administrative Remedies**. For prisoners, did you use up all administrative remedies for each claim before you filed your complaint in the district court? If you did not, please tell us why.

- Not a Prisoner
- All administrative remedies were reasonably exhausted included EEOC administrative remedies for claim 2 retaliation upon filing an EEOC charge.

**PROCEEDINGS BEFORE THE COURT OF APPEALS**. In this section, we ask you about issues related to this case before the court of appeals and any previous cases you have had in this court.

6.      What issues are you asking the court to review in this case? What do you think the district court, or the BAP did wrong?

The plaintiff brings to the attention of the appellate courts multiple issues which includes:

- Summary Judgement issued on 12/28/2020 for racial discrimination, harassment, and defamation claims.

- The necessity of trial, examination, and cross-examination in this civil action.

- Dismissal on 12/17/2019 of the plaintiff claims of retaliation upon filing an EEOC charge, wrongful termination through Abuse of Power, Conspiracy Against Rights and Retaliation for works and assignment completed at a previous employer.

- Dismissal on 04/20/2020 of a motion for reconsideration of claim 2.

- Ruling pertaining to discovery disputes, discovery issues and motions to compel discoveries.

- Unequal applications of Court Orders, local court rules and FRCP rules to both parties./Favoritism toward the defendants

- Justly construing the "Pro Se" plaintiff's complaint and arguments throughout the court case as reiterated by Appellate Courts and Supreme Courts

- Ruling pertaining to the appointment of counsel for the plaintiff

**I.   <u>Summary Judgement issued on 12/28/2020 for racial discrimination, harassment, and defamation claims.</u>**

**Summary Judgement should have been granted in favor of the plaintiff and not in favor of the defendants**. When it comes to summary judgement in favor of the plaintiff, there is clear and irrefutable facts and evidence of racial discrimination, harassment, and defamation that cannot be genuinely disputed by the defendants. The African/Black plaintiff provided evidence of him being referred to as a "Problem Child" in official Boeing email communication between White Boeing employees (Please see Appendix I Pages 164 and 167). The plaintiff provided evidence of elements of racial discrimination, harassment, and defamation. The plaintiff also demonstrated deviation from written procedure and reckless falsity by the defendants in matter pertaining to the plaintiff. The plaintiff also demonstrated reckless disregard of truth and malice in false statements used to generate "fictitious" corrective actions against the plaintiff.

**As it pertains to issues with the district court decision to grant summary judgement to the defendants the issues are as follow**:

**A.  The defendants did not show or establish that there is no genuine dispute as to material facts in this civil action. The law does not support Summary Judgement on disputed facts. In fact, there is actually sufficient evidence for a reasonable jury to return a verdict in favor of the plaintiff.**

Please see Steve Simpkins emails provided in Appendix J. ( Page 281-282).Significant disputes exist on material facts of all claims. The law does not support Summary Judgement on disputed facts. **Significant disputed material Facts for racial discrimination, harassment and defamation are provided below:**

### a. Dillaman Jeffrey issues tactfully discriminative performance evaluations

On June 27th, 2018 and On November 14th, 2020, the white manager Dillaman Jeffrey issued tactfully discriminative performance evaluations where the African/ Black plaintiff actual and overall work performance is downgraded due to lower ratings on elements such as Communications, People Working Together and Customer Satisfaction.

They are about 13 different sections or categories that were evaluated in total. Please see Appendix C (Page 8-13). The plaintiff at least met expectation on all sections pertaining to his deliverables as an Industrial Engineer On 10 sections out of 13 sections the plaintiff was rated at least as "Met Expectation". This indicated that the plaintiff was satisfactorily completing work.

On the other 3 sections which were Communications, People Working Together and Customer Satisfaction the plaintiff was evaluated as "Met Some Expectations". Nevertheless, Dillaman Jeffrey summarized the overall plaintiff's performance as only "Met some Expectations" in an attempt to depict the plaintiff as a mediocre or poor performer. This rating is significant at it is the metric that contractually describe the overall performance of the African and Black Plaintiff. The  reason provided to the plaintiff is that "Other white employees  and white managers have complained about fears of approaching the African/Black plaintiff" and "Some White employees have refused to work with the African/Black plaintiff". This is a disputed material fact as it pertains to a discriminatory practice which favors other white employees without investigating false allegations affecting the Black Pro Se Plaintiff. Here, the overall stellar performance of the

African/Black plaintiff was downgraded with no proof, no justification and no investigation of false allegations reportedly made by white employees and managers.

### b. The Boeing Company issues a First Fictitious Corrective Action

On 09/04/2019, Dillaman Jeffrey and The Boeing Company issue a first fictitious corrective action alleging that the African/Black plaintiff did not write a Production Planning Change Request (PPCR) when asked by his manager.

In reality, the plaintiff wrote the PPCR after raising legitimate concerns. (Please See Appendix D Page 17 which depict the written PPCR on page 17).

Management request violated written procedure and the 777X control code documentation. Moreover, the technicians completing the tasks sat very close to the plaintiff and the plaintiff knew that the worked was being completed within a unique shop's budget. Not only did management request violates procedures, but also did the plaintiff knew that he would be misrepresenting manufacturing work activities and providing a false indication of actual workflow and responsibilities by writing such a PPCR. This was a matter of ethics and integrity.

Further analysis completed by the plaintiff demonstrated that budget reasons provided management in this occurrence were false, that management lied, and the plaintiff was penalized for no valid reason after being forced to produce a false depiction of manufacturing workflow and activities. Moreover, the plaintiff had already received approval from the relevant Boeing Managers for the completed work and such with no requirement for a PPCR. Multiple managers that had direct authority over the specific work statement had already provided their approval for the plaintiff's work. There was no issue with the work completed by the plaintiff. Please see Appendix E (Page 27). No other white analysts had to experience this type of occurrences.

### c. The Boeing Company issued a 2nd Fictitious Corrective Action

On February 7th, 2020, the Boeing Company issued a second fictitious corrective action based on nothing but false statements and harassment. In this action, the plaintiff is penalized for not signing a performance evaluation which by law or internal regulations he is not required to do. The plaintiff is also penalized for task relevant management have refused to approve. In this inexplicable set of circumstances, the plaintiff is asked to complete a task he has already completed and provided to Boeing Manufacturing management who vehemently rejected this work statement.

In matter of fact, our team was well aware of this rejection which rendered the tasks obsolete. Nevertheless, the African/black plaintiff get penalized for allegedly not completing the tasks. The refusal came from relevant white Boeing managers who were presented with a valid analysis based on the actual assembly successfully completed by his technicians. Nevertheless, the African/Black plaintiff is labelled as insubordinate and actions are taken against the African/Black plaintiff in a case where it is Boeing Managers that refused to move on with the implementation. Please see Appendix G (Page 61) Topic: "Small Feederline to Large Feederline".

### d. The Boeing Company issued a 3rd Fictitious Corrective Action and by Such Wrongfully terminating the plaintiff's employment.

A third set of false allegations were brought against the African/Black plaintiff on approximately April 10th, 2019. The plaintiff's employment was wrongfully terminated on May 13th, 2019. In this new set of falsity, Dillaman Jeffrey and the Boeing Company keeps accusations and allegations vague. The most important element is that the defendants opted to blame their program shortcomings and poor decision making on the plaintiff. They were provided with analysis showing how having only 3 capable technicians as opposed to the recommended 18 technicians was the main cause of delays for the shop. The plaintiff generated multiple analysis

demonstrating how a rotation of a minimum of 12 technicians and a maximum of 18 technicians will alleviate the manufacturing issues. The plaintiff even created a new planning method which models delays based on previous build and optimized assembly schedules through mathematical iterations. The defendants disregarded valid analysis. The plaintiff also demonstrated how late parts, lack of tools and equipment's, sequential delays due to other shop work statement and work statement revision such as the rewrite of testing operations which delays Doors assembly were the issues that needed to be addressed. The African and Black plaintiff generated multiple solutions based on 3 hypothetical cases and variable inputs. Please see Appendix I (Page 181- 262). The Doors Shop lead also provide details on the real program level issues that were affecting the shop and causing delays. Please see Appendix J Page (281 to 282)

      **e.  The plaintiff was subjected to acts of racial discrimination, harassment, and defamation throughout his employment.**

Appendix I (Page 164) displays and proves how the African/Black plaintiff who was a 2nd level Engineer was often referred to as a "Problem Child" throughout official Boeing email communications between Boeing employees, Boeing leads and Boeing Managers. Appendix I (Page 167) also show how Dillaman Jeffrey, a white Boeing Manager, continue to relay this derogatory term to refer to the plaintiff throughout Fact Finding investigations, communications with SPEEA and Communications specific to internal EEOC investigations. This is a violation of Title VII of the Civil Rights Act of 1964.

With such sufficient existing evidence that the African/Black plaintiff was subjected to severe racially discriminatory language with frequency and the fact that the use of the term " Problem Child" to refer to the African/ Black plaintiff even by itself is evidence or racial animus,

the defendants cannot genuinely dispute the fact that the plaintiff has been subjected to racial discrimination and harassment.

Appendix I (Page 99) show how the Defendants continue to harass the plaintiff and attempt to intimidate and force the plaintiff to sign a discriminatory performance evaluation. The defendants included the plaintiff refusal to sign and approve an act of discrimination in a finding against the plaintiff. This was used as an element to issue a 2nd fictitious corrective actions against the plaintiff. This was used as a tool to wrongfully terminate the plaintiff's employment.

This is a violation of Title VII of the Civil Rights Act of 1964. There are no internal regulations or Federal or State law that requires the plaintiff to sign any material especially a discriminatory performance evaluation that was an inaccurate and damaging representation of the plaintiff's work.

Appendix J (Page 281 to 282) details program issues and the real problems that were a hurdle to timely completion of tasks. Appendix I (Page 101-109) display dispute of material facts in this civil action. As an example, the defendants cannot deny that they lied when they stated that the plaintiff did not complete a required task pertaining to the move of IP(s) from small feederline to Large feederline. Materials in Appendix I (101-109) displayed false accusations used as an element to generate a 2nd fictitious corrective action used as a tool to wrongfully terminate the plaintiff's employment. While emails data displayed in Appendix G (Page 61) displays that not only had the plaintiff completed the required small feederline to large feederline tasks but also was Boeing Management in opposition of such tasks being completed. Such Boeing Managers, who were the stakeholders, instructed against completion of the tasks and provided a rebuttal of requests being made to the plaintiff. Nevertheless, and despite the facts that all relevant managers and individuals were aware of such, they knowingly and purposely raise this as an internal fact finding issue against the African and Black plaintiff and used this as an element to write a 2nd fictitious

corrective action used as a tool to wrongfully terminate the plaintiff's employment. This purposeful reckless disregard of the truth which was published within the company and to a company called TALX UCLM services was used as an element to terminate the plaintiff's employment and by such violating Washington State Defamation Laws: *RCW 9.58: Libel and Slander.*

Throughout Appendix K (Page 289-308), the defendants are seen making the type of false and racially motivated prejudicial accusations that has characterized the plaintiff employment with the Boeing Company. The defendants are seen stating that the following: "*Upon his termination, he utilized his laptop to send an email to an unknown source with an attachment*". The defendants cannot genuinely dispute the falsity of this accusation and Appendix B shows how such false statements were propagated throughout the internal EEOC Investigation and later proven to be false. The fact that White employee continued with unfounded and false accusations against the African/Black plaintiff even after his departure from the Boeing Company demonstrate the level of reckless defamation and in this particular case racial discrimination to which the African and Black plaintiff was subjected throughout his employment and even after his departure. These have contributed to the harming the plaintiff through wrongful termination and a continuation of detrimental acts for the purpose of preventing the plaintiff from securing employment.

### f.   Racial Discrimination and Harassment

***The defendants cannot genuinely dispute the fact that white Boeing employees and managers have used derogatory and insulting terms to refer to the African/Black plaintiff throughout his employment with the Boeing Company.***

The African/Black plaintiff was often referred to as a "Dog", a "Bulldog", a "Problem Child", a "Rat" , a "Carpet to be stepped on with approval from management", a "Slave Worker". Appendix I Page 164 displays and proves how the African/Black plaintiff who was a 2nd level Engineer was often referred to as a "Problem Child" throughout official Boeing email communications between Boeing employees, Boeing leads and Boeing Managers. Appendix I Page 167 also show how Dillaman Jeffrey, a white Boeing Manager, continue to relay this derogatory term to refer to the plaintiff throughout Fact Finding investigations, communications with SPEEA and Communications specific to internal EEOC investigations. This is a violation of

With such sufficient existing evidence that the African/Black plaintiff was subjected to severe racially discriminatory language with frequency and the fact that the use of the term " Problem Child" to refer to the African/ Black plaintiff even by itself is evidence or racial animus, the defendants cannot genuinely dispute the fact that the plaintiff has been subjected to racial discrimination and harassment.

***The Defendants cannot also genuinely dispute the fact that they treated the African/Black plaintiff differently than other white employees and deviated from written process, procedures and instructions in matter pertaining to the plaintiff.*** As an example, the defendants deviated from instructed PPCR procedure, 777X control code map details, and Fact Finding procedure in stating and proclaiming in the first "fictitious corrective action" that a PPCR was not written by the plaintiff and within official communications that a PPCR was required. Appendix D page 17 Appendix D Page 23, 24 and 25,  Appendix E page 27 and Appendix I Page show that the PPCR was written after appropriate concerns and analysis from the African/Black plaintiff. Appendix D Page 23, 24 and 25 show the defendants making false statement by referring to the 777X control code map as an old budget list when the material provided through discovery

show that this 777X control code map was in fact the authority in determining budget allocation per control code. Moreover, the defendants cannot deny that the tasks were completed within an identical shop and budget as analysis record show that the individuals performing the tasks belong to that unique shop.  None of the other  industrial engineers whether they be of a white race or another race were subjected to these circumstances. The plaintiff was in the right in stating that per instructions and procedure, no PPCR was required. Furthermore, the defendants lied as it pertains to the budget reasons provided. In addition to such, the defendants cannot deny the PPCR was written in contrary to statements made within the first "fictitious corrective actions written against the plaintiff and used as a tool to  wrongfully terminate the plaintiff's employment.

***The defendants cannot genuinely dispute the fact that they recklessly harass the African/Black plaintiff by attempting to intimidate and force the African/Black plaintiff to sign a discriminatory performance evaluation.***

Appendix I (Page 99) show how the Defendants continue to harass the plaintiff and attempt to intimidate and force the plaintiff to sign a discriminatory performance evaluation. The defendants included the plaintiff refusal to sign and approve an act of discrimination in a finding against the plaintiff. This was used as an element to issue a 2nd fictitious corrective actions against the plaintiff. This was used as a tool to wrongfully terminate the plaintiff's employment.

***The defendants cannot genuinely dispute the fact that they have committed further acts of discrimination and retaliation against the African/Black plaintiff upon his filing of a racial discriminatory charge with the EEOC.***

The relatively short gap between the plaintiff completion of a protective activity: a filing of a racial discrimination charge with the EEOC on 03/18/2020 and his wrongful termination on 05/13/2019 is undeniable. Although in "Dkt 21 at 11", the defendants insinuate that they did not

have knowledge of the plaintiff's EEOC Charge, records show that the Defendants were already aware of the plaintiff's filing with the EEOC by April 1st Please see Appendix H (Page 64 and Page 65). Appendix I (Page 99 to 109) depicts false accusations being contrasted by Appendix I (Page 181-260). A third set of false allegations were brought against the plaintiff on approximately April 10th, 2019. The plaintiff's employment was wrongfully terminated on May 13th, 2019. This act of retaliation through further discrimination against the plaintiff and the wrongful termination of his employment upon his filing of an EEOC charge are a violation of Title VII of the Civil Rights Act of 1964.

### g. Defamation

***The defendants cannot genuinely dispute the fact that they have recklessly disregarded the truth in handling of matters pertaining to the plaintiff.***

The falsity depicted in each "fictitious" corrective action described in section I 3, 4 and 6 were construed through a reckless disregard of the truth as seen with each supporting appendix. Not only were these falsities communicated to other companies such as Talx UCLM services, but also were they used to harass and harm the plaintiff. They led to the wrongful termination of the plaintiff's employment.

Appendix J details program issues and the real problems that were a hurdle to timely completion of tasks. Appendix I (Page 99-109) display example of how false accusations were constructed against the plaintiff for the purpose of issuing defamatory and fictitious corrective action. As example the defendants cannot deny that they lied when they stated that the plaintiff did not complete a required task pertaining to the move of IP(s) from small feederline to Large feederline. Materials in Appendix I (Page 99) displayed false accusations used as an element to

generate a 2nd fictitious corrective action used as a tool to wrongfully terminate the plaintiff's employment. While emails threads displayed in Appendix I (Page 108-109) displays that not only had the plaintiff completed the required small feederline to large feederline tasks but also was Boeing Management in opposition of such tasks being completed. Such Boeing Managers, who were the stakeholders, instructed against completion of the tasks and provided a rebuttal of requests being made to the plaintiff. Nevertheless, and despite the facts that all relevant managers and individuals were aware of such, they knowingly and purposely raise this as an internal fact finding issue against the African and Black plaintiff and used this as an element to write a 2nd fictitious corrective action used as a tool to wrongfully terminate the plaintiff's employment. This purposeful reckless disregard of the truth which was published within the company and to a company called TALX UCLM services was used as an element to terminate the plaintiff's employment and by such violating Washington State Defamation Laws: *RCW 9.58: Libel and Slander.*

**The defendants cannot genuinely dispute the fact that they recklessly disregarded the truth in published and relaying false and unfounded information about the plaintiff including within internal EEOC investigation.**

Throughout Appendix M (Page 314 to 338), the defendants are seen making the type of false and racially motivated prejudicial accusations that has characterized the plaintiff employment with the Boeing Company. The defendants are seen stating that the following: "*Upon his termination, he utilized his laptop to send an email to an unknown source with an attachment*".

The defendants cannot genuinely dispute the falsity of this accusation and Appendix M (Pages 314 to 338) shows how such false statements were propagated throughout the internal EEOC Investigation and later proven to be false. The fact that White employee continued with unfounded

and false accusations against the African/Black plaintiff even after his departure from the Boeing Company demonstrate the level of reckless defamation and in this particular case racial discrimination to which the African and Black plaintiff was subjected throughout his employment and even after his departure. These have contributed to the harming the plaintiff through wrongful termination and a continuation of detrimental acts for the purpose of preventing the plaintiff from securing employment. These acts from the defendants violate both Washington State Defamation Laws: *RCW 9.58: Libel and Slander and* Title VII of the Civil Rights Act of 1964.

## B. Discovery disputes and Court Ruling Not on Par with Rule 33 of the FRCP.

There are significant materials not produced throughout discovery. Multiple interrogatories were directly addressed to Boeing Managers. The defendants refused to provide answer to interrogatories claiming that such individuals are not representative of the Boeing Company which is false and labelled subsumed and necessarily related items to the primary questions as subparts. Courts have been using the related questions test. Related questions do not count as subscrete parts when subsumed. Please see "Forum *Architects, LLC VS Candella No 1:07-CV-190-SPM/AK, 2008 WL217119", Case N° 12-60322-CIV-Williams/Seltzer*

*"Federal Rule of Civil Procedure 33(a)(1) permits a party to serve on any other party 25 interrogatories (without leave of court), "including all discrete subparts."*

*The Rule, however, does not define "discrete subparts." "Resolving questions of whether a subpart to an interrogatory is 'discrete' under Rule 33 such that it should be counted separately can be a difficult task and 'courts considering this question have applied various tests.'" Oliver v. City of Orlando, No. 6:06-cv-1671-Orl-31DAB, 2007 WL 3232227, at \*2 (M.D. Fla. Oct. 31, 2007) (quoting Williams v. Taser Int'l, Inc., No. 106-cv-51-RWS, 2007 WL 1630875, at \*2 (N.D.*

*Ga. June 4, 2007)). "District courts in the Eleventh Circuit, like most district courts in other circuits, have adopted and applied 'the "related question" test to determine whether the subparts are discrete, asking whether the particular subparts are "logically or factually subsumed within and necessarily related to the primary question."' The Mitchell Company, Inc. v. Campus, No. CA 07-0177-KD-C, 2008 WL 2468564, at \*14 (S.D. Ala.  June 16, 2008) (quoting Forum Architects, LLC v. Candella, No. 1:07CV190-SPM/AK, 2008 WL 217119, at \*1 (N.D. Fla. Jan. 23, 2008)); see also Powell v. The Home Depot USA, Inc., No. 07-80435-Civ, 2008 WL 2473748, at \*2 (S.D. Fla. June 16, 2008) (Hopkins, M.J.) ("Courts within the jurisdiction of the Eleventh Circuit have recently followed what is known as the 'related question test' to determine whether a subpart in an interrogatory should be considered discrete.").*

*"If the subparts are subsumed and necessarily related to the primary question, then the subpart is not 'discrete' within the meaning of Rule 33(a)." Oliver, 2007 WL 3232227, at \*2. By way of example, the following types of interrogatories have been deemed to be not discrete and, hence, constitute one interrogatory: (1) questions about persons with knowledge and the subject area of their knowledge; (2) questions about prior lawsuits, the nature of the cause of action, the parties, the court in which the lawsuit was filed, and the dates filed; (3) questions about witness statements, by and to whom made, when made, and the substance and context of the statements; (4) questions about persons with documentary evidence in their possession, custody, and control, what documents they have, the location of the documents, and when the documents were prepared; (5) questions about expert witnesses, their addresses, qualifications, subject matter of their testimony, and grounds for their opinions; (6) questions about damages, when the damages occurred, to whom expenses were paid; and (6) questions about lost income, benefits, or earning capacity, the nature of each loss, and how the loss was computed. See Powell, 2008 WL 2473748,*

*at \*2; Forum Architects, 2008 WL 217119, at \*1-3; see also Fed. R. Civ. P. 33, 1993 Advisory*

*Committee Notes (stating that an interrogatory should be treated as a single question "even though*

*it requests that the time, place, persons present, and contents be stated separately for each such*

*communication.")*

     Moreover, the defendants never actually complied with the plaintiff's request for production. The defendants only produced whatever they wished which included nothing but duplicate and reprinted materials and non-genuine materials. The defendants also left out significant evidence and materials pertaining to this case. But most importantly here, even after court instruction upon a discovery dispute hearing to provide email communication between the plaintiff and specified manager for provided topic and timelines, the defendants never complied and/or produced such materials.

     **C.  The defendants violated legal procedures and local court rules with the plaintiff's deposition that they relied upon for their motion for summary judgement. This issue renders the deposition unusable or unacceptable for this civil action.**

     Deposition transcripts were made purchasable to the plaintiff only September 4th after the closure of discovery on September 2nd. Discovery in this matter closed on September 2, 2020. *Order Setting Trial Date and Related Dates*. The plaintiff also never reviewed and approved the content of the deposition transcript. To this day, the plaintiff is unaware of what is included/discussed in the deposition transcripts. Please see Appendix L (Page 312). None of the arguments and references made by the defendants based on this deposition is admissible in this civil action. The court stated the following: *"Defendants assert that Plaintiff could have ordered his transcript on the day of his Deposition, and Plaintiff has not produced evidence to show this*

*was not the case. Additionally, he does not claim that there are any inaccuracies within the transcript calling into question its authenticity. As such, the Court denies this objection".*

In reality, the plaintiff was not provided with an opportunity to order the deposition transcript on the day of his deposition. The defendants and its Court report only requested contact information and told the Pro Se plaintiff that they will contact him when the deposition is ready and available for purchase. Such was not done until after discovery has ended. Until this day of the December 31st of 2020, the plaintiff does not have a copy of the deposition transcript. Given that the defendants were only contacted after discovery, use of the deposition violated court rules Discovery in this matter closed on September 2, 2020. *Order Setting Trial Date and Related Dates*. As a reminder, the court rejected and denied the plaintiff motion to compel discoveries by the defendants and third parties for this very reason. **The FRCP rules, local court rules and court orders have not been applied impartially to both parties. As shown above the defendants have received significant preferential treatments as well as leeway to violates such legal and court mandate strictly held against the plaintiff.**

### D. Employment discrimination cases are rarely subjected to the grant of Summary Judgement.

Employment discrimination cases are rarely subjected to the grant of summary judgment. In considering a motion for summary judgment, Courts are "cautioned that 'summary judgment should seldom be granted in employment discrimination cases'" and that "[o]nly in rare cases when there is no dispute of fact and there exists only one conclusion should summary judgment be granted." EEOC v. General Motors Corp., 11 F.Supp.2d 1077, 1080 (E.D.Mo. 1998), citing Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994). See also DiLaurenzio v. Atlantic Paratrans, Inc., 926 F. Supp. 310, 314 (E.D.N.Y. 1996) (holding that the severity and pervasiveness

of harassing conduct "is the sort of issue that is often not susceptible of summary resolution"). The court in EEOC v. General Motors Corp., supra, relied on the Eighth Circuit's reasoning that "because discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." Crawford, supra, 37 F.3d at 1341. Under the rule and cases noted, a moving party must convince the Court the evidence in the record presents no material fact at issue. **The existence of a factual dispute precludes courts from granting summary judgment**. The moving party cannot succeed "unless the right to summary judgment is shown with such clarity that there is no room left for controversy." *Commonwealth v. Whitworth,* 74 S.W.3d 695, 698 (Ky., 2002).

### E. The court did not evaluate critical materials and evidence provided by the plaintiff provided within his opposition to the defendants' motion for summary judgement.

The court stated the following : *Plaintiff offers nothing to contradict Defendants' version of events. The exhibits he references in his brief as evidence do not contain the terms, he alleges he was called. This is a consistent issue with Plaintiff's briefing as both the exhibits he attached to his Motion for Summary Judgment and to his Opposition consist of one document, with 255 and 338 pages respectively, without an index or identifiable organizational scheme. Often, the appendices within each file contain documents unrelated to each other and Plaintiff's in text citations do not serve to aid the reader in navigating to what exactly within each appendix he intends his reference to refer. See Defendants Motion (both complaining of the lack of organization and clear reference within Plaintiff's exhibits). The Court has done its best to review the pro se Plaintiff's exhibits for the support he alleges, but the old adage that "Judges*

*are not like pigs, hunting for truffles buried in briefs" applies. Clark v. Chappell, 936 F.3d*

*944, 982 (9th Cir. 2019) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991)*

*(per curiam)); see also Californians for Renewable Energy v. California Pub. Utilities*

*Comm'n, 922 F.3d 929, 935–36 (9th Cir. 2019) (quoting Keenan v. Allan, 91 F.3d 1275, 1279*

*(9th Cir. 1996) ("On summary judgment, 'it is not our task . . . to scour the record in search*

*of a genuine issue of triable fact.'").*

This depiction of evidence provided by the Pro Se plaintiff indicates a significant issue in navigating the materials provided by the plaintiff due to alleged difficulties in navigating and reading the materials. The court also point to alleged organizational issues. But in reality, the materials presented by the plaintiff as evidence is a simple PDF file with the exhibits organized alphabetically by appendix A to M. If reviewed electronically, the PDF "Bookmarks" and "Thumbnail" features allow for a simple and easy navigation to each specific element. If reviewed through paper printed copies, the plaintiff specified page numbers for each specific labelled appendix. In this case, the materials the plaintiff referred to as evidence in his filings is easily found because each appendix is labelled alphabetically. It is nearly impossible not to easily find materials specified as evidence by the plaintiff within his filings.

Given the page restriction specified for motions by the court in its "*Standing Order for All Civil Case*",  the plaintiff combined all Appendixes into one exhibit simply organized from Appendix A to Appendix M. This may have perhaps caused some confusion, but it is difficult to imagine that each appendix was not retrievable by the court given that all appendixes are organized in alphabetic order.

**F. The court does not have a mean for understanding critical technical background, context, regulations, process, procedures, instructions, and circumstantial factors that pertains to materials submitted by the defendants.**

The court makes significant references to materials submitted by the defendants. The Court even refers to one random Steve Simpkins email that essentially constitute of nothing but an opinion which clearly depict a poorly informed and unaware individual frustrated by program shortcomings and daily manufacturing issues arising from a lack of concurrent work process and conflicting requests from the plaintiff's management.

**The insinuations being made by the court reflected the lack of context and the critical need for a trial, examination, and cross-examination in this civil action**. The court does not have any means   of understanding the technical background, context, regulations, process, procedures, instructions, conflicts, constraints, issues, subtle practices, occurrences, and violations that pertains to materials presented by the defendants.

With the opposition by the court and the defendants to the use of polygraph in this civil action for the purposes of determining the actual truth in witness testimonies and materials provided to the court by the parties, only through questioning of witnesses during trial and cross-examinations can the plaintiff demonstrate to the court and the members of the jury, the real circumstances, premediated falsity, and maliciousness that characterized management requests and the materials provided by the defendants. Trial and cross-examination shall allow the Pro Se plaintiff to ask specific questions that the defendants refused to answer throughout interrogatories and discovery. Trial and cross-examination shall allow the Pro Se plaintiff to question witnesses under oath for the purpose of establishing the actual truth in this civil action and such without any reasonable

doubts. As an example, while **the court agonizes the plaintiff based on a random Steve Simpkins email provided below**:

*" I' m through with Setondji V Nahum. It has become quite apparent to me that he has made no effort to even research the door package to any level of understanding. At this point he is a waste of my time, that I am quite short of these days. I resent the fact that I have been made to deal with an obvious problem child for the IE world, that you have saddled with one of the most difficult packages to manage. If this was your idea on how to get rid of him then you should have placed him on an easy package that he could fail at. I really don't think there is any package he could handle in S&I, let alone one that is split between S&I and Final Assy. Every Sat I have put in for IE help has been an argument. And then someone else would have to get involved to fix it correctly. I don't need this and I refuse to assist him or explain things he has not bothered to look into in any way. I don't even think a Bar chart has even been created for my control code of 260, but if it was it was probably done by Kien. I am not going to do his job for him. Give me someone competent to manage my package!"."*

The court does not realize or understand that such Steve Simpkins email could not possibly reflect the truth because the plaintiff has successfully produced a significant number of materials to support the shop. None of the deliverables produced by the plaintiff and shown throughout *Appendix I (Page 181 to 260)* could not have been completed if Steve Simpkins email reflected a truthful assertion. The deliverables produced by the plaintiff are extensive and go well beyond any defined expectations for an Industrial Engineer at the Boeing Company. It is actually the fact that such deliverable highlighted program shortcomings and procedural issues that further resentments of the plaintiff were expressed through fictitious corrective action.

**The plaintiff now points to another Steve Simpkins email provided below** and also in Appendix J page 281-282. The text of such email is provided below. Please note that such email was sent prior to the one constantly referred to by the court and provided above in italics.

*"In light of this requirement for IE being tasked to come up with a recovery plan of my manpower, I feel the need to enlighten all the people above that in reality there is none. We have tipped over in sense I'm tired of explaining this over and over to all that ask me. My crew now consists of 8 riggers and myself a TL. Of these, one knows Cargo doors, 3 know both Cargo doors and Entry doors, 1 only know Entry doors, but 1 is on medical restriction for Knees. We have one PED rigger that finally was able to get a class for his certs, but has no OJT logged and is not*

*certified. @ new guts have no certs and are shadowing our riggers but cannot work the plane. We left one of our Cargo door guys with the mainline in a trade for a more experienced guy that is learning the functional test package which none of us know. When the trade gets finalized, he will become TL for down line because it is impossible for me to carry both areas. So, to sum up, I have 5 riggers working on the plane and 3 that do nothing for me.*

*L/N 1574: (64 pieces of paper) This plane is currently held for Functional test group so we can finish 2 tests on the cargo doors. None of my people have installed liners for 777 so this will be learning to install them will be painfully slow. On top of that the liners the mainline is receiving from our new supplier are falling apart before we can install them, and during installation. I expect many problems, since the mainline has a crew on the Flightline trying to sell traveled liners. We have a bad handle box on SED RH which with a new handle cam ordered. Don't even know if this will fix the issue, but this issue is spreading, and 3 more doors have it on 1581. We still have slide weights that need to be recovered off this plane with by crane because we don't have enough after having to give 2 to the static plane. We will probably have to give up 2 more to L/N 9996 which will leave us without any because this requirement was ordered late when the Static plane rolled through. I do not know the status of where the 4 are that they ordered. We will not be able to rig SED doors in S&I after L/N 9996.*

*L/N 1581: (120 pieces of paper) moved into Final Assy last week and worse than the last 2 planes only had about 3 stands to 3 doors. It didn't matter because even if there was a stand at every door, I do not have the manpower to work them. All the rig checks need to be worked on 13 doors for High blow test. We have 137 pieces of paper on this plane. FAA conformity has forced all our rig checks to require a lot more checks and documentation to sell these IPs.*

*L/N 1587: Depending on who you talk to this plane will move to FBJ on 25th. We have 185 open pieces of paper which is cluttered up with many FAA Conformity IP's and requirements on IP's. Also 6 of my Entry doors changed the design of liner brackets to cover snap in liners I have 4 in engineering for design changes. This has also caused all the pick sheets to be bad because of late Eng. I think that soon I will have FAA Conf 10 OSIPs transferred to the field, but we will probably travel around 150. My focus will have to be to get every slide pack on the entry doors before it moves regardless of if they are ready for them. FBJ does not have access to work most of the doors, so these will pile into Final Assy eventually impacting us immensely. Some slides will have to be removed in plane to finish S&I work.*

*L/N 9996 will only have 95 IP's when it loads, but it will still require manpower to work because there is no final assy position. The Mainline has tried to give us assistance but they do not have enough manpower to support their own work package. They are trying to catch up liners currently being worked on the field. The issues they are having with our new supplier of liners will most likely be affecting us soon too. Basically, the mainline is down about 10 riggers and so is 777X. This started 2 years ago when they did not backfill people leaving on VLO, followed by taking our 777X riggers to train them. This has been complicated more by Training's requirement of OJT on riggers. They recently picked a couple riggers, and I was told we were getting 2, but they need a cert class and then OJT, followed by working with someone to learn the jobs. This will take months! When I ordered Standards kits for S&I, I requested 3 of every kit which is how the mainline was set up to ensure recycle and no delays. I was given only 1 of every kit. We have been basically been building the plane out of emergent need bags for the last 4 planes. We have so many behind IP's that we cannot give up kits that will prevent catch up of lost jobs. This doesn't even make up for the fact that much of the revisions we requested on the first 4 planes were largely ignored. So, on top of engineering changes, we are starting the slow process of correcting what kits we have.*

*This has been complicated more by the recent developments regarding compliance in the wake of the 767 fiasco. We just can't have a bunch of standard bags anywhere to help build the plane. In light of all these issues my crew of 5 working on the plane and me working paper are now being designated for weekends. We are over 350 behind with another 95 loading. So that tells me I will be designated for my last year in the factory, which may speed up my retirement plans. My current priorities are High blow on 1581 and cutting down how much 1587 will lose to FBJ and eventually will shut down high blow in final. Then I worry about 9996 that will leave after FBJ incomplete. 1574 is already lost and if the plane has to fly without liners, they will get Eng to allow it. Just how would you divide up 5 employees over this mess as a recycling plan? Send everyone to 1574? Sacrifice high blow on 1581? Slide everything from S&I into Final Assy? Ignore 9996 and send my guys outside to work on a plane in the Fatigue jig, like they did with the static which ate up 2 weeks of pain. Good luck with your plan"*

As you can see the above Steve Simpkins email is very instructive. Given the importance given by the court to Steve Simpkins emails , this email from Steve Simpkins speaks for itself. It shows the absurdity of requests made to the plaintiffs by highlighting production and manufacturing constraints that affected the shop. But most importantly, it highlights the need for trial, examination, and cross-examination for the purpose of showing and demonstrating to the court the real circumstances and context that pertains to facts in this civil action.

### G.  The need for trial, examination, and cross-examination in this civil action.

The court did not realize that only through trial and cross-examination can the plaintiff demonstrate the following:

- The PPCRs requested that resulted in fictitious corrective actions were in reality a request to depict falsity. Given technicians work responsibilities, the PPCR requested by management represented a false depiction of actual workflow. The concerns voiced by the plaintiff were righteous and supported safety practices.

- Materials provided by the defendants do not show that management requests were contradictory, conflicting, and often violated procedures and instructions.

- Materials provided by the defendants do not show that requests made by management were often impossible due to a lack of engineering and production data.

- Management was unaware or pretended to be unaware of constraints that prevented tasks for being completed.

- The defendants' arguments are fostered by falsity, misconstrue facts, deception, and the realization that the court could not possibly understand the intricate details of manufacturing and production as it pertains to the program.

- Dillaman Jeffrey was often the accuser and the investigator in his actions against the plaintiff as human resources did not have the mean to understand the technical materials submitted by the plaintiff as evidence against the false accusation brought up to his attention.

- The defendants did not comply with discovery. They refused to answer interrogatories. They also did not provide Boeing management specific materials as instructed by the court hearing upon discovery dispute hearing.

**H. There shall be no barriers to justice.**

US Courts including the Appellate Courts and  the Supreme court have reiterated that Courts and the Judiciary System shall not raise barriers which prevent the achievement of truth and justice and the issuance of a just judgement in a civil action. Here, the district court has shockingly rendered itself a barrier to justice by granting summary judgement to the defendants in spite of the existence of significantly disputed facts. But the law does not support summary judgement on disputed facts. The court also prevented an evaluation and establishment of the real truth and the real circumstances in this case through trial, examination, and cross-examination.

With the court and the defendants' oppositions to the use of polygraph to evaluate witness testimony and materials provided by the parties in this case, only through cross-examination can the plaintiff provide the necessary insight into the context, technical background, regulations, process, procedures, instructions, conflicts, constraints, issues, subtle practices, occurrences, and violations that pertains to materials facts of this case. The necessity of such is illustrated by the Steve Simpkins emails Provided in Appendix J. (Page 281 to 282).

**II.     Dismissal on 04/20/2020 of a motion for reconsideration of claim 2.**

**The plaintiff's claim for retaliation upon filing an EEOC charge against the defendants shall not have been dismissed.**

The district court did not consider or evaluate the merits of this motion for reconsideration before to reject it and recommend that it be taking up to the Appellate court. Here, the defendants withheld significant evidence supporting a retaliation upon filing an EEOC charge until the claim was dismissed by the Judge. Upon the plaintiff's review of discovery materials, the plaintiff noticed the falsity of statements and allegations issued by the defendants which insinuated that they did not know about the plaintiff's filing of an EEOC charge. Thus, the plaintiff filed a motion for reconsideration of claim 2 based on the new elements which demonstrated knowledge by the defendants of the plaintiff's filing as well as elements of retaliation upon filing such an EEOC charge.

The plaintiff reiterates that he did exhaust all administrative remedies available under the specific circumstances. The plaintiff could not have taken another meeting with the EEOC to report acts of retaliation. Such options were not available and that was clearly explained to the plaintiff within the 2nd meeting that occurred on the 19th of April 2019. The EEOC investigator provided

a thorough explanation to the plaintiff explaining that since the adverse party was still the Boeing Company and one of its representatives, a new case could not be created.

On March 18th, 2019, the plaintiff filed an E.E.O.C. racial discrimination charge. The E.E.O.C. notifies organization within 10 business days. The defendants affirmed the following: "*Although Plaintiff alleges that dillaman issued the third and final CAM which caused his termination, he does not allege that dillaman had knowledge of his EEOC charge. Absent such knowledge, there can be no inference of causation between his protected activity and his termination*" But*, a*s early as April 1st specific/direct management and the individuals behind the reported retaliatory acts were already responding to emails specific to the EEOC charge. This means that they knew about the EEOC charge much earlier enough to provide a response on the 1st of April. As early as April 18th , 2019, the defendants were seeking to terminate the plaintiff's employment. On April 1st, an investigative report seeking to terminate the plaintiff's employment was issued to the employee union, SPEEA. A position statement was provided by the Boeing Company to the EEOC on May 9th, 2019. The plaintiff's employment was wrongfully terminated by the defendants on May 13th, 2019. The representative of the Boeing company who signed the action immediately discharging the plaintiff on May 13th is Jeffrey Dillaman, the defendant. **There are barely eight weeks between the day of the plaintiff officially filing a charge with the E.E.O.C. and the day of the wrongful termination of the plaintiff's employment by the defendants**.

**III.    Dismissal on 12/17/2019 of the plaintiff claims of retaliation upon filing an EEOC charge, wrongful termination through Abuse of Power, Conspiracy Against Rights and Retaliation for works and assignment completed at a previous employer.**

The plaintiff's claims for retaliation upon filing an EEOC charge, wrongful termination, Conspiracy against rights and retaliation for work and assignment completed at previous employers should not have been dismissed by the district court.

The defendants have subjected the plaintiff to significant subtle and silent wicked advert acts. These illegals actions against the plaintiff by the defendants fell under multiple statutory violations. The plaintiff brought such issues to the court through the liberty afforded to "Pro Se" filers with the understanding that Courts construe "Pro Se" complaints. **The District Court did not construe the plaintiff's "Pro Se" complaint. Instead, it actually held the plaintiff's complaint to unreasonably stringent standards which prevented any reviews or evaluations of the actual truth and material facts presented by the plaintiff in the claims**.

As an example, the plaintiff did not cite the right basis for jurisdiction for the Conspiracy Against Rights claim and such was used as a basis for dismissal. The plaintiff cited 18 U.S.C. Section 241 instead of 42 U.S.C. Section 1985. The court decision to dismiss this specific claim because of the "Pro Se" plaintiff's citing of a basis of jurisdiction is not reasonable. *"If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements"*. Boag v. MacDougall, 454 U.S. 364 (1982). *"In addition, the court should apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name"*. Higgins v. Beyer, 293 F.3d 683, 688 (3d Cir. 2002).

**IV.** **Ruling pertaining to discovery disputes, discovery issues and motions to compel discoveries.**

The District Court rulings pertaining to motion to compel, discovery disputes and discovery issues have not been impartial. Here, the district court rulings have been unreasonable and exhibited preferential treatments towards the defendants.

**First**, the defendants never actually complied with the plaintiff's request for production. The defendants produced whatever they wanted. They produced a significant amount of non-genuine and repetitive materials often recycling multiple lengthy threads of emails already produced. **The District Court did not directly address these issues in the discovery hearing**.

**Second**, the defendants refused to answer interrogatories questions. **The Court Ruling is not on par with rule 33 of the FRCP**. The plaintiff provided both the court and the defendants details of what US Courts have considered "discrete parts". The District Court ruling disregarded the definition of "discrete parts" and US Courts approach to determining what constitute "discrete parts". *Federal Rule of Civil Procedure 33(a)(1) permits a party to serve on any other party 25 interrogatories (without leave of court), "including all discrete subparts." The Rule, however, does not define "discrete subparts." "Resolving questions of whether a subpart to an interrogatory is 'discrete' under Rule 33 such that it should be counted separately can be a difficult task and 'courts considering this question have applied various tests.'" Oliver v. City of Orlando, No. 6:06-cv-1671-Orl-31DAB, 2007 WL 3232227, at \*2 (M.D. Fla. Oct. 31, 2007) (quoting Williams v. Taser Int'l, Inc., No. 106-cv-51-RWS, 2007 WL 1630875, at \*2 (N.D. Ga. June 4, 2007)). "District courts in the Eleventh Circuit, like most district courts in other circuits, have adopted and applied 'the "related question" test to determine whether the subparts are discrete, asking whether the particular subparts are "logically or factually subsumed within and necessarily related to the*

*primary question.'" The Mitchell Company, Inc. v. Campus, No. CA 07-0177-KD-C, 2008 WL 2468564, at \*14 (S.D. Ala. June 16, 2008) (quoting Forum Architects, LLC v. Candella, No. 1:07CV190-SPM/AK, 2008 WL 217119, at \*1 (N.D. Fla. Jan. 23, 2008)); see also Powell v. The Home Depot USA, Inc., No. 07-80435-Civ, 2008 WL 2473748, at \*2 (S.D. Fla. June 16, 2008) (Hopkins, M.J.) ("Courts within the jurisdiction of the Eleventh Circuit have recently followed what is known as the 'related question test' to determine whether a subpart in an interrogatory should be considered discrete."). "If the subparts are subsumed and necessarily related to the primary question, then the subpart is not 'discrete' within the meaning of Rule 33(a)." Oliver, 2007 WL 3232227, at \*2. By way of example, the following types of interrogatories have been deemed to be not discrete and, hence, constitute one interrogatory: (1) questions about persons with knowledge and the subject area of their knowledge; (2) questions about prior lawsuits, the nature of the cause of action, the parties, the court in which the lawsuit was filed, and the dates filed; (3) questions about witness statements, by and to whom made, when made, and the substance and context of the statements; (4) questions about persons with documentary evidence in their possession, custody, and control, what documents they have, the location of the documents, and when the documents were prepared; (5) questions about expert witnesses, their addresses, qualifications, subject matter of their testimony, and grounds for their opinions; (6) questions about damages, when the damages occurred, to whom expenses were paid; and (6) questions about lost income, benefits, or earning capacity, the nature of each loss, and how the loss was computed. See Powell, 2008 WL 2473748, at \*2; Forum Architects, 2008 WL 217119, at \*1-3; see also Fed. R. Civ. P. 33, 1993 Advisory Committee Notes (stating that an interrogatory should be treated as a single question "even though it requests that the time, place, persons present, and contents be stated separately for each  such communication.")*

**Third**, the defendants did not abide by court ruling in the discovery hearing demanding that elements directly issued to or pertaining to Boeing managers be produced. They also violated discovery deadlines and FRCP rules pertaining to discovery. Deposition transcripts were made purchasable to the plaintiff only September 4th after the closure of discovery on September 2nd. Discovery in this matter closed on September 2, 2020. *Order Setting Trial Date and Related Dates*. The plaintiff also never reviewed and approved the content of the deposition transcript. To this day, the plaintiff is unaware of what is included/discussed in the deposition transcripts. Please see Appendix L (Page 312). None of the arguments and references made by the defendants based on this deposition is admissible in this civil action. The court stated the following: *"Defendants assert that Plaintiff could have ordered his transcript on the day of his Deposition, and Plaintiff has not produced evidence to show this was not the case. Additionally, he does not claim that there are any inaccuracies within the transcript calling into question its authenticity. As such, the Court denies this objection"*. In reality, the plaintiff was not provided with an opportunity to order the deposition transcript on the day of his deposition. The defendants and its Court report only requested contact information and told the Pro Se plaintiff that they will contact him when the deposition is ready and available for purchase. Such was not done until after discovery has ended. Until this day of the December 31st of 2020, the plaintiff does not have a copy of the deposition transcript. Given that the defendants were only contacted after discovery, use of the deposition violated court rules Discovery in this matter closed on September 2, 2020. *Order Setting Trial Date and Related Dates*. As a reminder, the court rejected and denied the plaintiff motion to compel discoveries by the defendants and third parties for this very reason. **The District Court did not hold such violations against the defendants as it should have even after the plaintiff brought such to the District Court's attention**.

**V.    Justly construing the "Pro Se" plaintiff's complaint and arguments throughout the court case as reiterated by Appellate Courts and Supreme Courts**

Per Title III Rule 8 (d) (1) of the Federal Rules of Civil Procedure: *No technical form is required. Each allegation must be simple, concise, and direct.* Per Title III Rule 8 (e) of the Federal Rule of Civil Procedure, "*Pleadings must be construed so as to do justice*". Under Rule 8a(2) of the Federal Rules of Civil Procedures, a short and plain statement of the claim showing that the pleader is entitled to relief is sufficient. "*There is no requirement that the pleadings state facts or ultimate facts or facts sufficient to constitute a cause of action.*" " *Dioguardi v. Durning*, 139 F.2d 774 (2d Cir. 1944). Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment. They should not raise barriers which prevent the achievement of that end". "*Maty v. Grasselli Chemical Co., 303 U.S. 197 (1938). "Pro se pleadings, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers*." Erikson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520-521(1972*). "If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements"*. Boag v. MacDougall, 454 U.S. 364 (1982). "*In addition, the court should apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name"*. Higgins v. Beyer, 293 F.3d 683, 688 (3d Cir. 2002).

**The District Court did not construe the plaintiff's complaint and arguments throughout the civil action. Instead, it inexplicably held the plaintiff's complaint and arguments to unreasonable stringent standards while amply allowing the defendants missteps and violations of court orders, local court rules and FRCP rules**.

**VI.     Unequal applications of Court Orders, local court rules and FRCP rules to both parties./Favoritism toward the defendants**

The District Court allowed the defendants to violate Courts Orders, local court rules and FRCP rules it strictly held against the plaintiff. Even when the plaintiff brought such discrepancies and lack of impartiality to the attention of the District Court, the District Court did not take any action to correct these issues. While the District Court would compel the plaintiff to produce materials or comply to requests from the defendants, the District Court rejected all motions to compel issued by the plaintiff to the defendants and third parties in this civil action. The district Court often cited disadvantages for the defendants and discovery deadlines. But the District Court never held such discovery deadlines against the defendants. The District Court also never considered or cited any disadvantages or inconvenience for the plaintiff as it often did for the defendants throughout the civil action.

**VII.     Ruling pertaining to the appointment of counsel for the plaintiff**

The District Court initially instructed that counsel be appointed for the plaintiff. Given the status of the defendants and since none of the counsels appointed to the plaintiff actually practiced any of the law fields specific to the civil action and none of the counsels appointed to the plaintiff had ever undertaken racial discrimination, employment discrimination, harassment, defamation, and other claims brought to the Court by the plaintiff, the plaintiff filed a motion for the appointment of new legal counsel that possibly practices within the specific law fields pertaining to the civil action. The District Court inexplicably denied such motion and annulled its initial decision appointing counsel. **Denying the plaintiff's counsel was not a reasonable action by the District Court. The plaintiff had valid concerns and raised valid points pertaining to appointment of counsel**.

7.    Did you present all issues listed in Question 6 to the district court or the BAP?
      Answer yes or no: __**Yes**_____

      If not, why not?

8.    What law supports these issues on appeal? (You may refer to cases and statutes, but you
      are not required to do so.)

**Significant disputes exist on material facts of all claims. In ruling on a motion for**
**summary judgment, the facts must be viewed in the light most favorable to the non-moving**
**party. See Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008).**

**Summary judgment is appropriate when the moving party shows, based on the discovery**
**and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to**
**any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.**
**56(a).** "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"
Vineberg, 548 F.3d at 56 (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).
"A fact is material only if it possesses the capacity to sway the outcome of the litigation under the
applicable law." Id. (quotations, punctuation and citations omitted).

        The moving party bears the initial burden of establishing that there is no genuine issue of
material fact. See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). If that
burden is met, the opposing party can avoid summary judgment only by providing properly
supported evidence of disputed material facts that would require trial. LeBlanc v. Great Am. Ins.
Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d
72 (1994). "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading,'"
but must set forth specific facts showing that there is a genuine issue for trial. Id. (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)). The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. See Vineberg, 548 F.3d at 56. "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

   **Pleadings must be construed so as to do justice.**

   Per Title III Rule 8 (d) (1) of the Federal Rules of Civil Procedure: *No technical form is required. Each allegation must be simple, concise, and direct.* Per Title III Rule 8 (e) of the Federal Rule of Civil Procedure, "*Pleadings must be construed so as to do justice*". Under Rule 8a(2) of the Federal Rules of Civil Procedures, a short and plain statement of the claim showing that the pleader is entitled to relief is sufficient. "*There is no requirement that the pleadings state facts or ultimate facts or facts sufficient to constitute a cause of action.*" " *Dioguardi v. Durning*, 139 F.2d 774 (2d Cir. 1944). Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment. They should not raise barriers which prevent the achievement of that end". "*Maty v. Grasselli Chemical Co., 303 U.S. 197 (1938). "Pro se pleadings, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers*." Erikson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520-521(1972*). "If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements"*. Boag v. MacDougall, 454 U.S. 364 (1982). "*In addition, the court should*

*apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name".*

Higgins v. Beyer, 293 F.3d 683, 688 (3d Cir. 2002).

Table 1: Tables of laws supporting issues and claims on appeal.

| Claims | Supporting Laws |
|---|---|
| Racial Discrimination | Title VII of the Civil Rights Acts of 1964 42 U.S.C. Section 1981 |
| Retaliation Upon Filing and EEOC Charge | Title VII of the Civil Rights Acts of 1964 |
| Wrongful Termination through the Abuse of Power | Title VII of the Civil Rights Acts of 1964 |
| Harassment | Title VII of the Civil rights Acts of 1964 |
| Defamation | RCW 9.58 : Libel and Slander |
| Conspiracy Against Rights | 42 U.S.C. Section 1985 |
| Retaliation for work performed at previous employer | Title VII of the Civil Rights Acts of 1964 |

The Federal Rules of Civil Procedure specified procedures for the court proceedings. The local district court local rule and a Court Issued Standing Order for all Civil cases also provided proceedings regulations for the civil action.

9.  **<u>Other Pending Cases.</u>** Do you have any other cases pending in the court of appeals? If so, give the name and docket number of each case.

    **No, the plaintiff does not currently have any other cases pending in the court of appeals.**

10. **<u>Previous Cases.</u>** Have you filed any previous cases that the court of appeals has decided? If so, give the name and docket number of each case.

    **No. As of the date of filing this appeal brief, the plaintiff has not filed any previous cases that the court of appeals has decided.**

9th Cir. Case No. <u>21-35008</u>                                             Page 48

**SETONDJI VIRGILE NAHUM**

_____
Name

_____

**20221 Aurora Ave. N. # 106_____**

**Shoreline, WA 98133_____**            **03/04/2021**
_____          _____
Address                                                         Date